**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| KRISTI STENSENG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-2480-JAR |
| | ) | |
| J.A. PETERSON REALTY CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Kristi Stenseng brings this action alleging discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964 ("Title VII").[1]  This matter comes before the Court on defendant J.A. Peterson Realty Co.'s Motion for Summary Judgment (Doc. 50) and Motion for Sanctions under Rule 37 (Doc. 55).  The motions are fully briefed and the Court is prepared to rule.  For the reasons stated below, defendant's summary judgment motion is denied and its motion for sanctions is also denied.

### I.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2]  A fact is only material under this standard if a dispute over it would affect the outcome

---

[1] 42 U.S.C. §§ 2000e–2000e-17.

[2] FED. R. CIV. P. 56(c).

of the suit.[3]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[4]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[5]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[6]  Where, as here, the moving party does not bear the burden of persuasion at trial, it may satisfy this burden by showing "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[7]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[8]  Furthermore, the record is to be viewed in the light most favorable to the nonmoving party.[9]

## II.    Uncontroverted Facts

The following facts are either uncontroverted,[10] stipulated to, or taken in the light most favorable to plaintiff.  Plaintiff began working for defendant as assistant manager of Kings Cove Apartments ("Kings Cove") on or about February 7, 2007.  She was hired by Carri Schwartz, the

---

[3]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4]*Id.*

[5]*Id.* at 251–52.

[6]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[7]*Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

[8]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[9]*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[10]The Court notes that plaintiff failed to controvert defendant's statement of facts pertaining to similarly-situated employees.  And defendant failed to controvert any of the additional facts asserted by plaintiff, instead, asserting "additional facts" in its reply brief.  This is inappropriate.  The parties are urged to review D. Kan. R. 56.1; it clearly sets forth the appropriate procedure for asserting and responding to uncontroverted facts on summary judgment.

manager of Kings Cove. Schwartz has held the position of manager of Kings Cove since January 2007.

Plaintiff became pregnant in November 2006 and was pregnant throughout her employment; she gave birth to her daughter on July 25, 2007, which was earlier than her due date of August 8, 2007. Schwartz learned that plaintiff was pregnant "shortly after" plaintiff began working at Kings Cove. Before Schwartz left for a planned vacation that began on June 10, 2007, plaintiff asked Schwartz for a meeting to discuss her maternity leave. Schwartz told plaintiff that they would talk about maternity leave when she returned from vacation.

Marilyn Light, the regional manager for defendant J.A. Peterson Realty who manages Schwartz, met and spoke to plaintiff on May 17, 2007 at Kings Cove. At that time, Light was not aware that plaintiff was pregnant. Light did not believe that plaintiff's appearance was different than when they had met last in March 2007, despite the fact that plaintiff was six months pregnant in May. Light maintains that she did not learn that plaintiff was pregnant until August 2007.[11]

Schwartz testified in her deposition that she "keep[s] Ms. Light informed of everything that occurs on my properties."[12]

### Bookkeeping Errors

Plaintiff's job duties as assistant manager included bookkeeping, accounting for Kings

---

[11]Plaintiff objects that Light's deposition testimony on this point should be excluded because it is a subjective assertion from an interested witness, citing no law for this proposition. Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to. Clearly, Light has personal knowledge of when she subjectively learned that plaintiff was pregnant. Plaintiff points the Court to no authority for the proposition that a person's testimony must be excluded simply because they are interested. This issue goes to credibility and not the admissibility of Light's testimony. Of course, the Court is not to make credibility determinations on summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[12](Doc. 66, Schwartz Dep. 37:18–21.)

Cove, posting rent payments, pursuing collection of unpaid charges, showing apartments to prospective tenants, renewals, and balancing ledger. When a tenant moved in during the middle of the month, the monthly rent would be prorated from the move-in date to the end of the month. Schwartz would enter the pro-rated rent data for new tenants into the computer accounting system. Schwartz sometimes set up computer entries for new tenants.

Light sent an email to Schwartz on April 17, 2007, that stated:

> Carri- We have talked about this to both you and the assistants, which is the matter of creating charges to RNT. Doing so screws up the reports horribly. This will be my last e mail to request never to create a charge to RNT. If Kristi or yourself does not know what to do with prepaid money or extra money, then have them call us, but never under any circumstances create a [sic] this type of charge. There are currently 7 different profiles at Kings Cove that have charges created under RNT. Cheryl will have to fix these. You will remember we teased you guys that we chop off fingers for doing this, now we are not teasing anymore. If you or Kristi do not know how to post extra money call first we will help you - so as not to muck up our general ledger. Cheryl has volunteered to come over next week to show Kristi and yourself some dos and don'ts. Please e mail her to give her a time and date she can stop by to help Kristi so that our records are not always in a mess. This e mail is to document for the record, never-ever create a charge to RNT - Next time I won't be as nice. No one ever likes the blonde girl mad![13]

This email was copied to plaintiff and Cheryl Coffman, the Manager of Information Systems for defendant. In April 2007, plaintiff and others received additional training, including posting procedures, on the PMAS system that documents tenant charges and payments from Coffman.

On May 4, 2007, plaintiff emailed Coffman to let her know that plaintiff had erred by posting six deposit checks to the wrong account. She stated that she had forgotten her reading glasses so she misread the account numbers. She stated, "I will not do that again—promise!"

_____

[13](Doc. 54, Ex. 4.)

4

Coffman responded later that day and told plaintiff to email her with the list of incorrectly posted checks so that she could correct the error.  On May 7, plaintiff emailed her a list of six names of tenants who had written the deposit checks that plaintiff incorrectly posted.  On May 8, Coffman responded, "I have moved these monies for you to the Security Deposit Acct.  I also found several people that had not been prorated in so I created their prorate in charges."  Coffman listed eight names of tenants who had not been "prorated in," and then told plaintiff: "Remember that when you move a tenant in on the computer you need to click the prorate button, & post your miscellaneous charges through the Create Bank Deposit."  Schwartz and Light were both copied on this email.[14]

On June 5, 2007, Schwartz emailed plaintiff: "I need to make sure you have gotten some of your deposits to H.O., I received an email from Joyce looking for them."  Plaintiff responded, "Okay.  I am getting it done."[15]

On June 18, 2007, Coffman sent an email to Schwartz and plaintiff stating that she had "made corrections for prorate charges & incorrectly posted receipts."  Coffman listed thirteen names for whom receipts were either posted incorrectly or no pro-rate charges were created, or both.[16]  Three of these names were on the list of mistakes plaintiff self-reported in her May 7, 2007 email to Coffman.   Plaintiff acknowledged that she was responsible for the posting errors referenced in the emails.  Schwartz could not determine from the email who made the errors.  Schwartz acknowledged that she may have made some of the errors.

### *Plaintiff's Termination*

---

[14](Doc. 54, Ex. 1.)

[15](Doc. 54, Ex. 22.)

[16](Doc. 54, Ex. 3.)

5

Light decided to fire plaintiff on June 18, 2007, after she received the email from Coffman setting forth the corrections she had made for prorate charges and incorrectly posted receipts.[17]  Schwartz informed plaintiff that she was fired on June 19, 2007, during a face-to-face meeting in Schwartz's office.  Schwartz told plaintiff that a prospective resident and a resident from another one of defendant's properties, who were looking for apartments at Kings Cove, had complained and said that plaintiff was rude to them.  After plaintiff denied that she had been rude to these potential tenants, Schwartz told her that she did not know why plaintiff was being terminated and that she would need to talk to Light.  Plaintiff demanded that Schwartz compose a letter during this meeting, stating the reason for her termination; Schwartz wrote the letter stating that plaintiff was being terminated because her employment "did not work out as planned."[18]

Plaintiff attempted to call Light and left a voice mail message for her.  Light returned her call and left a voice mail message for plaintiff stating that there were bookkeeping issues and that she did not think it was going to work out.

In an email to Light on June 19, 2007, Schwartz relayed her conversation with plaintiff:

> I let her know that the position was not working out.  She wanted
> to defend herself and wanted to know why.  I said again, that it

---

[17]Plaintiff objects to several pieces of evidence offered to show that Light made the decision to fire plaintiff. First, defendant cites to Schwartz's deposition where she was asked who decided to terminate plaintiff "in your mind?"  Schwartz responded, "Ms. Light[]."  (Doc. 54, Ex. 5 at 59:10-12).  Plaintiff objects that this is speculation and is somehow inadmissible because it is made by an "interested party."  The Court overrules both objections. Schwartz testified about her own understanding of who decided to terminate plaintiff, testimony that is entirely within her own personal knowledge.  *See* Fed. R. Evid. 602.  And defendant points the Court to no rule that a statement by an interested party is inadmissible simply by virtue of the fact that they are an interested party.  If that was the rule, none of plaintiff's deposition testimony would be admissible.

Next, defendant objects to the email from Light to Schwartz, where she states that "I was the one who told instructed [sic] you to end the employment relationship and that I definitely felt it was just not working out."  (Doc. 54, Ex. 9.)  Defendant objects on the grounds that it is hearsay.  But, to the extent this is a statement made by a declarant, it is made by a party-opponent, so it is not hearsay.  Fed. R. Evid. 801(d)(2).

[18](Doc. 54, Ex. 7.)

6

was not working out.  She wanted information, like a bafoon I said, there have been some complaints, I then said again that it wasn't working out.

She wanted in writing that I wasn't giving her a reason, so I did so, and said the same thing.  She wanted to speak with you, and I let her know that you and I had already spoken.  She will probably still call you, I just wanted you to know what all happened so you would be prepared

That was really the jist of it.  She wanted me to pin point a reason and tried to argue the situation.[19]

Plaintiff's counsel sent an initial demand letter to defendant, and defendant's counsel responded by letter on September 21, 2007.  In that letter, defendant's counsel states that plaintiff was terminated because her employment at Kings Cove "was not working out because of repeated errors in posting tenant rent payments, security deposits and other entries in the computer system that Kings Cove uses to track tenant payments."[20]  After plaintiff filed her claim with the Equal Employment Opportunity Commission ("EEOC"), defendant's counsel submitted a position statement stating that plaintiff was fired for "repeated mistakes, primarily posting errors."  Counsel also wrote, "Her performance of the required duties of the position was not working out."

### *Relevant Employment Policies*

Plaintiff was not entitled to paid vacation until she was employed by defendant for six months and, as of July 25, 2007, plaintiff would not have been employed by the defendant for six months.  Defendant also follows the Family Medical Leave Act and provides up to twelve weeks of unpaid leave to its employees for medical or maternity leave.  Defendant does not have a

---

[19](Doc. 54, Ex. 9.)

[20](Doc. 54, Ex. 12.)

separate written maternity leave policy.

Peterson includes an anti-discrimination policy in the packet of information given to new employees. This policy prohibits discrimination based on sex, among other protected classes. But Schwartz does not explain the anti-discrimination policy to new employees and the policy has never been explained to her.

Defendant has a "no-tolerance" policy prohibiting employees from using controlled substances on company property and during work hours.

### Other Employees at Kings Cove

Michael Jensen was a part-time clubhouse attendant from October 2006 until October 14, 2008. His duties did not include data entry, posting payments, collecting rent, or processing evictions; his work duties were not similar to plaintiff's. Schwartz told plaintiff on two different occasions that tenants reported Jensen smoking marijuana in the billiard room of the clubhouse. Schwartz took no disciplinary actions against Jensen and instead posted the billiard room as a no-smoking area. According to his Unemployment Compensation Separation Record, Jensen was terminated because the clubhouse was closed for renovation.

Schwartz supervised one other pregnant employee, Austin Durkee, in 2008. Durkee spoke to Schwartz about taking maternity leave when she was due in July 2008. In an email to Light on April 2, 2008, Schwartz stated:

> I was planning on having Shanon here while she is off. OR, considering a part-time position to be hired in for the 3 months. ???? I know that temp agencies are really high but just looking at all options. The only reason I was contemplating another person is to keep both TO and KC open on Saturdays thru the summer months.[21]

---

[21](Doc. 66, Ex. 16.)

Light responded:

> When gone 12 weeks we would be required to hold the position
> open if she wants it. If gone longer than 12 weeks then not
> required. I would go ahead and just hire someone, since she is
> thinking about staying home, it might very well happen, and quite
> often they will decide to do so. If you hire someone and they turn
> out to be wonderful and great at leasing, we could always transfer
> them to another location, or continue to use them if they keep up
> leased up, if Austin would indeed come back and stay. The first
> couple of week[s] back would let you know if working full time
> will continue to be her choice. If you hire someone, you can train
> them and be covered without worries at a reasonable cost. That
> would be my option of choice.[22]

## III.    Discussion

Title VII makes it an unlawful practice for an employer "to discharge any individual . . .

because of such individual's race, color, religion, sex, or national origin."[23]  The prohibition of

discrimination "because of sex," includes "because of or on the basis of pregnancy, childbirth, or

related medical conditions."[24]  In the absence of direct evidence of discrimination on summary

judgment,[25] the court applies the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*[26]

and *Texas Department of Community Affairs v. Burdine.*[27]  Under this framework, plaintiff must

---

[22]*Id.*  The Court disregards the additional evidence set forth in the reply brief, as plaintiff did not have an opportunity to challenge its validity or relevance.  *See, e.g.*, *W. Coast Life Ins. Co. v. Hoar*, 558 F.3d 1151, 1157 (10th Cir. 2009).

[23]42 U.S.C. § 2000e-2(a)(1).

[24]*Id.* § 2000e(k).

[25]Here, plaintiff concedes that there is no direct evidence of pregnancy discrimination.  (Doc. 66 at 21.)

[26]411 U.S. 792 (1973).

[27]450 U.S. 248 (1981); *see Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006); *Maldonado v. City of Altus*, 433 F.3d 1294, 1307 (10th Cir. 2006); *Black Educ. Network, Inc. v. AT & T Broadband, LLC*, 154 F. App'x 33, 44 (10th Cir. 2005); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).

first prove a prima facie case of discrimination.[28]  If plaintiff is able to sustain this burden, the

burden of production shifts to defendant to "articulate a legitimate, nondiscriminatory reason for

rejection."[29]  If defendant sustains that burden, the burden of production shifts back to plaintiff to

show that defendant's proffered reason for rejection is false, or merely a pretext, and the

presumption of discrimination created by establishing a prima facie case "drops out of the

picture."[30]  Although the burden of production shifts back and forth between the parties, the

ultimate burden of persuasion remains at all times with the plaintiff.[31]

### A.    *Prima Facie Case*

To state a prima facie case of pregnancy discrimination, plaintiff must show: (1)

membership in a protected class; (2) that she was qualified for her job; and  (3) termination

under circumstances giving rise to an inference of discrimination.[32]  This burden is not onerous;

plaintiff is "'only required to raise an *inference of discrimination*, not dispel the non-

discriminatory reasons subsequently proffered by the defendant.'"[33]

There is no dispute that plaintiff is a member of a protected class and that she was

terminated.  Defendant argues that plaintiff cannot show that she was qualified for her job

because there is undisputed evidence that she could not perform the basic functions of the

---

[28]*See Burdine*, 450 U.S. at 252–53; *McDonnell Douglas Corp.*, 411 U.S. at 802.

[29]*See McDonnell Douglas Corp.*, 411 U.S. at 802.

[30]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

[31]*Burdine*, 450 U.S. at 253.

[32]*Smith v. Okla. ex rel. Tulsa County Dist. Attorney*, 245 F. App'x 807, 811 (10th Cir. 2007) (applying test in *Martin v. Nannie & The Newborns*, 3 F.3d 1410, 1417 (10th Cir. 1993) and collecting cases); *see also Sorbo v. UPS*, 432 F.3d 1169, 1173–74 (10th Cir. 2005).

[33]*Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000)).

assistant manager, given all of her bookkeeping errors. The Tenth Circuit has held "that a defendant cannot defeat a plaintiff's prima facie case by articulating the reasons for the adverse employment action . . . ."[34] Indeed, to hold otherwise would effectively deny the plaintiff "the opportunity to show that the reasons advanced by the defendant were pretextual."[35] Furthermore, the evidence does not support defendant's argument that plaintiff was not qualified for her position as an assistant manager, as it does not support the contention that she was unable to perform the bookkeeping duties required. The evidence tends to show that plaintiff did not perform one of her job functions, not necessarily that she was unable to do so. Given the non-burdensome requirements for making a prima facie showing,[36] the Court finds that plaintiff has sustained her "slight" burden of proof to establish that she was qualified for the assistant manager position at Kings Cove.[37]

### B.     Defendant's Burden of Production

Once plaintiff establishes her prima facie case, the burden under *McDonnell Douglas* shifts to defendant to demonstrate a legitimate, nondiscriminatory reason for its termination decision.[38] Defendant asserts that it terminated plaintiff because of her repeated bookkeeping mistakes, primarily posting errors. The Court finds that defendant has articulated a legitimate,

---

[34]*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192 (10th Cir. 2000) (citing *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1119–20 (10th Cir. 1991)).

[35]*Id.*

[36]*See, e.g.*, *Nguyen v. Gambro BCT, Inc..*, 242 F. App'x 483, 489 (10th Cir. 2007) (citing *Ortiz v. Norton*, 254 F.3d 889, 895 (10th Cir. 2001)).

[37]Plaintiff further argues that plaintiff is unable to show the third element, that she was terminated under circumstances giving rise to an inference of unlawful discrimination, pointing to its pretext analysis. The Court will address these arguments in the context of pretext, and finds that plaintiff has alleged sufficient evidence to sustain her slight burden of proof at the prima facie stage.

[38]*See, e.g.*, *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1191.

nonretaliatory reason for terminating plaintiff's employment.

## C.    Pretext

To defeat summary judgment, plaintiff must show that there is a genuine dispute of material fact as to whether defendant's explanations for terminating her employment are pretextual.[39]  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[40] While this burden is not onerous . . . it is also not empty or perfunctory."[41]  And in determining pretext, the Court must not act as a "super personnel department or second-guess [defendant's] good faith business judgments."[42]

In this case, plaintiff relies on the following pieces of circumstantial evidence to demonstrate pretext: (1) defendant's shifting reasons for plaintiff's termination; (2) differing treatment of similarly-situated individuals; (3) the temporal proximity between plaintiff's request to discuss maternity leave with Schwartz and her termination; (4) attitudes of Schwartz and Light toward another employee's pregnancy in 2008; (5) that plaintiff was not, in fact, responsible for many of the cited-to bookkeeping errors; and (6) that Light's testimony that she was unaware of plaintiff's pregnancy should not be credited.  The Court discusses each in turn.

---

[39]*Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1143 (10th Cir. 2009).

[40]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[41]*Id.* at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.  *Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[42]*Turner*, 563 F.3d at 1144 (quotations and citations omitted).

### *Shifting Reasons for Termination*

Plaintiff first points to the shifting reasons for termination provided to plaintiff by Schwartz during the June 19, 2007 meeting.  The undisputed facts show that Schwartz initially told plaintiff that defendant had received complaints from prospective Kings Cove tenants and then, when pressed, stated that the "position was not working out."  Then later in that same meeting, Schwartz told plaintiff that she did not know the reason for the termination and that she should ask Light.  Light told plaintiff in a voice mail that she was being terminated for the bookkeeping errors.  The Tenth Circuit has explained that a "change in explanation, accompanied by evidence that an original justification is false, could allow a jury to conclude that a second justification is likewise false."[43]  But the fact that one of defendant's explanations turns "out to be incorrect does not necessarily create a genuine issue of fact concerning pretext."[44]

In *Jaramillo v. Colorado Judicial Department*, the Tenth Circuit discussed the significance of evidence that an employer changed its explanation for an employment decision:

> Courts have looked to two factors to evaluate a change in the employer's explanation for an employment decision: (1) the timing of the change in position and (2) the evidentiary basis for the new rationale. The timing of the change has been found to support the inference of pretext when it occurs after significant legal proceedings have occurred. In *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672 (7th Cir.2003), the employer argued that it only hired individuals recommended by the union, and the union did not recommend the plaintiff.  However, during discovery, and in its initial briefing to the district court, the employer argued that it had a policy against rehiring workers who had been laid off. It did not advance the second explanation until

---

[43]*Zisumbo v. McCleodUSA Telecomm. Servs., Inc.*, 154 F. App'x 715, 724 n.5 (10th Cir. 2005) (discussing *Miller v. Eby Realty Grp. LLC*, 396 F.3d 105, 1112 (10th Cir. 2005)).

[44]*Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005).

> its reply brief on summary judgment. The court found that the
> employer's change of position late in the proceedings was "fishy"
> and might allow a jury to find pretext. Similarly, in *Cole*, the
> school district stated that it terminated the plaintiff, a school
> principal, because of budgetary constraints. After she filed an
> EEOC complaint, however, the district relied on the plaintiff's
> alleged inability to maintain a cohesive faculty.
>
> A change in position also supports a finding of pretext
> when the new rationale is unsupported by the evidence.[45]

The circumstances discussed by the court in *Jaramillo* are not present here. Here, Schwartz's

differing explanations for plaintiff's termination came in the same meeting and she directed

plaintiff to discuss the reasons further with her superior, Light. The uncontroverted evidence

shows that Light reiterated that the position was not working out and that she had made repeated

bookkeeping mistakes. Defendant's position that it terminated plaintiff due to bookkeeping

errors and that it was "not working out" has been consistent since Light's phone message and did

not change when defendant was threatened with legal action. Defendant's counsel asserted this

reason for plaintiff's termination in responding to plaintiff's demand letter and counsel repeated

this explanation in the statement to the EEOC.

The Court also finds a sufficient evidentiary basis for the "new" rationale that plaintiff

made repeated bookkeeping errors. Viewing the evidence in the light most favorable to plaintiff,

she only committed the errors associated with posting rent payments—with the errors associated

with prorate charges. Assuming that Schwartz committed those errors and that Light understood

that this was Schwartz's and not plaintiff's responsibility, plaintiff still admits that it was her

responsibility to post tenant payments and that multiple mistakes were made. Light complained

---

[45]*Id.* at 1311 (citations omitted). The court explained in *Jaramillo* that the employer changing its explanation under circumstances suggesting dishonesty or bad faith is an exception to the general rule that a plaintiff must successfully rebut all of the proffered explanations for the adverse employment action provided by the defendant. *Id.* at 1310.

to Schwartz and plaintiff in April 2007 about creating a "charge to RNT," and arranged for Coffman to provide them with extra training. Then in May, plaintiff self-reported six posting errors she had made. On June 18, 2009, Coffman reported to Light more posting and prorating errors. This evidence all supports defendant's "new" reason for plaintiff's termination, that she had committed multiple bookkeeping errors. The Court is unable to find that defendant's changing explanations for plaintiff's termination rises to the level of evidence of pretext. Defendant has consistently asserted that it terminated plaintiff generally because it "was not working out," and more specifically, because of repeated bookkeeping mistakes. This reason is supported by the evidence.

However, the Court agrees that Schwartz's behavior at the initial termination meeting could lead a reasonable jury to conclude that the reason cited for plaintiff's termination was unworthy of belief. There is no indication in the record that Schwartz was unaware of the purported reason for plaintiff's termination—the bookkeeping errors; yet, she declined to provide this reason to plaintiff when pressed. A reasonable jury could determine that her email to Light about the meeting suggests that she was attempting to hide the true reason for plaintiff's termination, as she told Light that "she wanted information, like a bafoon I said, there have been some complaints, I then said again that it wasn't working out." While the Court does not find that defendant's "shifting reasons" for plaintiff's termination are necessarily evidence of pretext, the Court does find that Schwartz's behavior during the termination meeting does suggest that her statement to plaintiff that it was not working out and that she had received complaints, were not the true reasons for her termination. A rational trier of fact could determine that defendant's stated reasons for plaintiff's termination were unworthy of credence based on this evidence.

***Similarly-Situated Employees***

Next, plaintiff suggests that similarly-situated individuals were treated differently. A plaintiff may show pretext by proving that similarly-situated nonprotected individuals were treated more favorably after committing comparable conduct.[46] "Similarly-situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."[47] To determine whether employees are similarly-situated, the Court "should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees."[48]

Plaintiff asserts that Jensen and Schwartz were similarly-situated employees belonging to a non-protected class. Plaintiff urges that Jensen was supervised by Schwartz and was not terminated by her, despite the fact that he repeatedly violated a written company policy of "no tolerance" for substance abuse in the workplace. Instead, Schwartz merely posted a no smoking sign in the area where Jensen was reportedly smoking marijuana. Defendant replies that Jensen is not similarly-situated because he was not performing a similar job and that Jensen has since been terminated for other reasons. Defendant does not reply to plaintiff's argument that Schwartz is also a similarly-situated employee.

Plaintiff's job duties as assistant manager are uncontroverted; they included bookkeeping, accounting for Kings Cove, posting rent payments, pursuing collection of unpaid charges, showing apartments to prospective tenants, renewals, and balancing ledger. Michael

---

[46]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

[47]*Rivera v. City & County of Denver*, 365 F.3d 912, 922-23 (10th Cir. 2004) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir.1997) (internal quotation marks omitted)).

[48]*McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

Jensen was a part-time clubhouse attendant from October 2006 until October 14, 2008. It is uncontroverted that he held none of the same job duties as plaintiff. The parties appear to agree, however, that he was supervised by Schwartz. While the Court agrees with plaintiff that Jensen's subsequent termination has no relevance to his treatment for violating company policy, it is unable to find that Jensen is similarly-situated to plaintiff. Their employment circumstances were quite different—plaintiff's job duties were purely clerical in nature, while Jensen worked as a clubhouse attendant. Also, while Jensen violated a company policy forbidding substance abuse in the workplace, plaintiff was terminated for repeated bookkeeping errors. The standard applied to plaintiff's work by Coffman and Light did not apply to Jensen and the Court finds that they were not similarly-situated.

Plaintiff also maintains that Schwartz was a similarly-situated individual—a much stronger argument. Schwartz and plaintiff were both supervised by Light and both held bookkeeping responsibilities that involved entering data correctly into defendant's accounting system. The emails from Light and Coffman in April, May, and June complain of errors made by both Schwartz and plaintiff, yet plaintiff was terminated and Schwartz, a non-pregnant employee, was not. The Court finds that this evidence could persuade a reasonable jury that defendant's stated reason for terminating plaintiff was pretextual.[49]

### *Temporal Proximity*

Next, plaintiff argues that the time between when she asked Schwartz to discuss her

---

[49]Defendant declined to respond to plaintiff's assertion that Schwartz constitutes a similarly-situated employee, acknowledging the argument by stating that "[p]laintiff's desperation is obvious in this statement due to the fact that earlier in the Response she was attempting to convince the Court that Schwartz was the decision maker with the discriminatory motive." (Doc. 68 at 10.) But this is a separate argument. As explained, *infra*, the Court rejects the argument that Schwartz was the decision maker; the evidence is uncontroverted that Light made the decision to terminate plaintiff and that Schwartz was merely the messenger.

maternity leave and the date of her termination is evidence of pretext. While close temporal proximity is a factor in showing pretext, it is not sufficient, standing alone.[50] The evidence shows that plaintiff asked Schwartz if they could discuss her options for maternity leave the day before Schwartz left for vacation and that plaintiff was terminated just after Schwartz returned from vacation. The evidence also shows that Schwartz kept Light apprised of everything that occurs on her properties. The Court agrees that this evidence could, in conjunction with other probative evidence, support a finding of pretext.

### *Durkee's Pregnancy in 2008*

Plaintiff suggests that evidence surrounding Durkee's request for maternity leave in 2008 shows that the stated reason for her own termination one year earlier was pretextual. The Court disagrees. The email between Schwartz and Light about Durkee's request for maternity leave took place in April 2008, approximately ten months after plaintiff's termination. To the extent plaintiff suggests that the email shows a pattern of discrimination that continued after her termination, she is mistaken. No reasonable jury could construe this email as evidence that Schwartz or Light held a discriminatory motive with regard to pregnancy. Schwartz merely informed Light of Durkee's anticipated maternity leave, inquiring about how much time off Durkee would be entitled to. Schwartz also set forth the advantages of hiring a replacement for the time when Durkee would be on maternity leave, referring to the cost of hiring a temporary worker. Light communicated to Schwartz that she would prefer to go ahead and hire someone new so that, in the event Durkee chose not to work full-time or to leave after her maternity leave, someone else would be in place already. She emphasized in the email that if Durkee chose to

---

[50]*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004); *see also Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009).

stay after her maternity leave, they would transfer the new employee to another location. This email is not evidence of discriminatory animus and does not support a finding of pretext.

### *Facts Known to Light—Responsibility for Bookkeeping Errors and Plaintiff's Pregnancy*

The parties disagree about whether certain facts were known to Light at the time the adverse employment decision was made. Plaintiff argues that Schwartz was responsible for many of the errors cited in Light's and Coffman's emails; they were not plaintiff's mistakes alone. Plaintiff also points to evidence that Sonja Williams may have entered some tenant entries from time to time. When evaluating pretext, the Court looks to the facts as they appeared to the decision maker, at the time of the decision to terminate.[51]

There is some dispute about who made the ultimate decision to terminate plaintiff, Schwartz or Light. While it is uncontroverted that Schwartz was the person who informed plaintiff of her termination, the evidence submitted on summary judgment shows that Light made the ultimate decision. The email from Light to Schwartz immediately after the termination meeting supports this conclusion, as does the fact that Light followed up with plaintiff by phone to tell her that the reason for her termination was the bookkeeping errors. Also, Schwartz testified in her deposition that she understood Light decided to terminate plaintiff. There is no evidence in the record, aside from the fact that Schwartz delivered the termination message, that Schwartz made the ultimate decision to terminate.

Given that Light made the decision to terminate plaintiff, the Court must consider the facts about who was responsible for the bookkeeping errors as they appeared to Light at the time

---

[51]*E.g.*, *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000); *Campbell v. Meredith Corp.*, 260 F. Supp. 2d 1087, 1105–06 (D. Kan. 2003).

she decided to terminate plaintiff. The uncontroverted facts show that on June 18, 2007, Coffman sent an email to Schwartz and plaintiff stating that she had "made corrections for prorate charges & incorrectly posted receipts." Coffman listed thirteen names for whom receipts were either posted incorrectly or no pro-rate charges were created, or both.[52] Three of these names were on the list of mistakes plaintiff self-reported in her May 7, 2007 email to Coffman. Plaintiff acknowledged that she was responsible for the posting errors referenced in the emails. But Schwartz acknowledged in her deposition that she may have made some of the errors as well. There is no direct evidence that Light understood that Schwartz may have made some of the errors set forth in the June 18 email from Coffman. But it is clear that, at least in April, Light was aware that both Schwartz and plaintiff were in need of additional training on the accounting system from Coffman due to bookkeeping errors. Even if Light only understood that plaintiff was responsible for posting receipts, not for prorating charges, it is uncontroverted that plaintiff in fact made many of these errors herself, so this does not constitute evidence that defendant's proffered reason for termination was a pretext for discrimination.

Plaintiff also contends that Light's assertion that she was not aware of plaintiff's pregnancy is not worthy of belief. Light testified during her deposition that she did not know that plaintiff was pregnant when she made the decision to fire her. She testified that she did not learn of plaintiff's pregnancy until after her termination. Plaintiff responds that Light met with plaintiff in May 2007 when plaintiff was six months' pregnant and that plaintiff would have been obviously pregnant at that time. Plaintiff also points to Schwartz's testimony that she made Light aware of everything that occurred at the Kings Cove property and it is uncontroverted that

---

[52](Doc. 54, Ex. 3.)

Schwartz was aware of plaintiff's pregnancy before she was terminated. The Court may not make credibility determinations and must view the evidence in the light most favorable to plaintiff. Given these standards, the Court finds that a reasonable jury could determine that Light's testimony on this point is not worthy of belief given that she had met with plaintiff in person the month before when plaintiff would have been visibly pregnant.

In sum, the Court finds that the evidence in support of pretext in this case is a close call, but plaintiff has adduced enough evidence upon which a reasonable jury could conclude that defendant had a discriminatory motive in terminating plaintiff's employment. A reasonable jury could conclude that Light was aware of plaintiff's pregnancy and could find that her decision to terminate plaintiff based on bookkeeping errors is unworthy of belief given Schwartz's behavior at the termination hearing, the fact that Schwartz was never disciplined for committing similar bookkeeping errors, and the proximity between when plaintiff requested a meeting about maternity leave and her termination. Considering this evidence as a whole, the Court finds that summary judgment is not appropriate.

## IV. Motion for Sanctions

### A. Background

Plaintiff alleges that defendant terminated her employment on June 19, 2007 because she was pregnant, in violation of Title VII. Plaintiff's counsel sent a demand letter on August 7, 2007, and plaintiff filed her EEOC charge on November 16, 2007. On October 1, 2008, this action was removed to federal court after being originally filed in Johnson County, Kansas District Court on September 19, 2008.

Before the case was filed, on March 19, 2008, plaintiff was deposed. During her deposition, defendant's counsel asked her questions about a former Kings Cove employee,

Antonia Hemming.  Plaintiff testified that Hemming worked at Kings Cove when plaintiff was hired and that Hemming was terminated in April 2007.  Plaintiff testified about a number of conversations between herself and Hemming.  First, plaintiff testified about Hemming's termination, stating that she called Hemming on the telephone after she had been terminated.[53]  Plaintiff testified that Hemming told her "Carri had fired her."  Plaintiff stated that she did not recall the reason for Hemming's termination.

Second, plaintiff testified that she "saw" Hemming on MySpace and had written communications with her.  "She asked how Isabel was doing.  I told her that I had my baby.  She said, How's Isabel doing?  I said, Good."[54]  She testified that Hemming told her on MySpace "that she was trying to get her unemployment and they had said that she had quit."[55]

After a break during the deposition, defendant's counsel asked plaintiff if she had spoken with Hemming on the telephone other than the first conversation after Hemming was fired:

> 3 A. I don't recall, but I -- I may have about, you
> 4 know, just seeing how she's doing. I think she
> 5 had told me at one time that she was pregnant
> 6 or something. But I don't recall if that was a
> 7 phone conversation or if it was through e-mail.
> 8 Q. Have you seen her?
> 9 A. No.
> 10 Q. Okay. And other than MySpace, you also e-mail
> 11 her?
> 12 A. Through MySpace.
> 13 Q. Through MySpace?
> 14 A. Uh-huh.
> 15 Q. Okay. When was the last time you had contact
> 16 with her of any kind?
> 17 A. Oh, gosh. I know that she had e-mailed me

---

[53](Doc. 62, Ex. 1 at 55.)

[54]*Id.* at 56.

[55]*Id.* at 57–58.

```
18 through MySpace, and she had said, Where are
19 you living now? And I would -- I remember
20 responding Independence. So it was sometime
21 between August of '07 until -- sorry, I'm going
22 to spit -- January 26th of '08. So it was
23 sometime -- because that's when I lived in
24 Independence.
25 Q. Okay.
```

Defendant represents in its motion for sanctions that it submitted written discovery asking for plaintiff's MySpace communications and requesting the hard drive to plaintiff's computer, after learning this information at plaintiff's deposition. Plaintiff produced her hard drive. Defendant retained a computer forensic company to copy plaintiff's computer and search the hard drive and plaintiff's MySpace pages on the MySpace servers.[56] Defendant attaches to its reply memorandum for the first time an affidavit from William Hoffman, a Senior Forensic Examiner for Alphalitigator, the company defendant retained to search plaintiff's computer and MySpace pages. Hoffman searched plaintiff's fixed hard drive, as well as her "deleted or removed files." Hoffman states that he did not have direct access to the MySpace server or to its backup, so he "could not recover or search for deleted items from the MySpace server."

In the Tenth Circuit, "if the court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to those new materials."[57] Because the Court will consider the affidavit attached to defendant's reply, it must grant plaintiff's motion for leave to file a sur-reply (Doc. 67).

### B.    Discussion

Defendant seeks discovery sanctions against plaintiff pursuant to Fed. R. Civ. P. 37(c) for

---

[56]Defendant did not attach to its motion the requests for production that include these requests.

[57]*Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1191 (10th Cir. 2006).

failing to preserve her email and/or MySpace communications with Hemming.  Sanctions for

violating the disclosure rules in Rule 26(a) and (e) are provided for in Rule 37(c):

> If a party fails to provide information or identify a witness as
> required by Rule 26(a) or (e), the party is not allowed to use that
> information or witness to supply evidence on a motion, at a
> hearing, or at a trial, unless the failure was substantially justified or
> is harmless.  In addition to or instead of this sanction, the court on
> motion and after giving an opportunity to be heard:
> (A)     may order payment of the reasonable expenses, including
>         attorney's fees, caused by the failure;
> (B)     may inform the jury of the party's failure; and
> (C)     may impose other appropriate sanctions including any of
>         the orders listed in Rule 37(b)(2)(A)(i)–(vi).

Fed. R. Civ. P. 26(a)(1)(A)(ii) requires the parties to provide, without waiting for a discovery

request, "a copy—or a description by category and location—of . . . electronically stored

information . . . that the disclosing party has in its possession, custody, or control and may use to

support its claims or defenses, unless the use would be solely for impeachment."

Defendant's motion does not request sanctions for failure to abide by a request for

production or for failure to abide by a court order.  Therefore, the Court may only impose

sanctions under Rule 37(c) if it finds that plaintiff failed to disclose the email(s) in question

under Rule 26(a).  As a threshold matter, plaintiff argues that she had no duty to preserve the

emails in question because they do not constitute information that she would use to support a

claim or defense in this case.  The Court agrees.  There is no indication that plaintiff's

communications with Hemming would support her claim in this case.  During her deposition,

plaintiff testified that she had communicated with Hemming about *Hemming's* termination in

April 2007, not about plaintiff's termination.  Plaintiff testified that they had later communicated

through MySpace and discussed plaintiff's baby after plaintiff was terminated.  There is nothing

in plaintiff's deposition testimony to support the contention that plaintiff may use these

communications in support of her claim that defendant discriminated against her.

It is obvious to the Court from the discussion in the parties' briefs that a request for production was made by defendant for the emails referred to in plaintiff's deposition and plaintiff attaches to her response a copy of the stipulation between the parties, whereby plaintiff agreed to make her hard drive and MySpace page available to Alphalitigator. But the request for production was not attached to defendant's motion, nor any evidence such as an affidavit to show that plaintiff admittedly destroyed the emails or that they are not available. In other words, defendant seeks sanctions for failure to produce documents but declined to produce evidence of the request for production that she purportedly failed to respond to. Nor did defendant ever file a motion to compel, or otherwise make an attempt to show that plaintiff failed to respond to a discovery request or court order. Therefore, the Court may not impose sanctions under Rule 37(b).

Alternatively, defendant appears to request spoliation sanctions because it alleges plaintiff destroyed evidence by deleting emails that she had a duty to preserve. Such sanctions are appropriate when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence."[58] The duty to preserve "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."[59] There can be no question that plaintiff had no reason to suspect that her electronic communications with Hemming would be relevant to future litigation prior to her termination. And the communications referenced in plaintiff's deposition testimony would

---

[58]*Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (quotation omitted).

[59]*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

not be relevant to litigation about her termination.  She testified that after her own termination, plaintiff and Hemming discussed such innocuous information as how plaintiff's daughter was doing and where she was living.  With regard to employment, Hemming told plaintiff that defendant had reported that she quit her employment, so she was having difficulty obtaining unemployment payments.  Defendant makes no attempt to explain why plaintiff would be on notice that this information was relevant to her own discrimination claim.

Even assuming plaintiff had a duty to preserve this information, defendant has not shown that it was prejudiced by the destruction of the MySpace emails.  Defendant's argument is essentially that it is prejudiced by the fact that it cannot determine whether it is prejudiced.  But defendant must show that it was "actually, rather than merely theoretically" prejudiced.[60]  To the extent defendant sought to prove that Hemming's communicated information about her termination to plaintiff that affected her own claim in some way, defendant could have deposed Hemming or more extensively examined plaintiff during her deposition.  Moreover, even if defendant had procured the MySpace communications described by plaintiff in her deposition, it would not have affected the outcome on summary judgment.  Defendant's motion was denied based on pretext evidence that would not have be refuted by the purported emails between plaintiff and Hemming, even assuming they existed and that they discussed information relevant to plaintiff's claims.

Finally, the Court notes that there is no evidence that MySpace emails between plaintiff and Hemming were in fact destroyed.  Hoffman searched plaintiff's fixed hard drive, as well as her "deleted or removed files" and did not find any emails   Hoffman states that he did not have

---

[60]*Turner*, 563 F.3d at 1150 (quotation omitted).

direct access to the MySpace server or to its backup, so he "could not recover or search for deleted items from the MySpace server." He also states that "the absence of a deleted file from the search of Alphalitigator is not confirmation that a file, email or message was not present or not deleted by the user." Notably, he does not attest that the absence of a deleted file is confirmation that the file was deleted. For all of these reasons, the Court denies defendant's motion for sanctions.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant J.A. Peterson Realty Co.'s Motion for Summary Judgment (Doc. 50) is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's motion for leave to file a sur-reply (Doc. 67) is **granted** and defendant's Motion for Sanctions under Rule 37 (Doc. 55) is **denied**.

**IT IS SO ORDERED.**

Dated:  October 15, 2009

<span> S/ Julie A. Robinson</span>
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE